**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SCARLETH TATIANA JARQUIN-GADEA,<br><br>            Petitioner,<br><br>    v.<br><br>KRISTI NOEM, et al.,<br><br>            Respondents. | Case No. ED CV 25-2800 FMO (BFM)<br><br>**ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS** |

On October 23, 2025, Scarleth Tatiana Jarquin-Gadea ("petitioner"), represented by counsel, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("Petition" or "Pet.") against Kristi Noem, Secretary of the U.S. Department of Homeland Security ("DHS"); Todd Lyons, Acting Director of U.S. Immigration and Customs Enforcement ("ICE"); Pam Bondi, Attorney General of the United States; Orestes Cruz, Acting Field Office Director of the San Francisco ICE Field Office; and Fereti Semaia, Warden of the Adelanto ICE Processing Center (collectively, "respondents"), in their official capacities. (Dkt. 1, Pet.).

With her Petition, petitioner filed an Ex Parte Application for a Temporary Restraining Order ("Application") seeking her immediate release pending the adjudication of her habeas petition. (See Dkt. 5, Application at 6). On October 24, 2025, court issued an order setting a briefing schedule on the Application and directing petitioner to serve a copy of the order on respondents. (See Dkt. 7, Court's Order of October 24, 2025). Petitioner filed a First Amended Petition ("FAP"), (see Dkt. 9), that same day, and timely filed a proof of service the following day. (Dkt. 10, Proof

of Service). Respondents filed their opposition to petitioner's Application on October 26, 2025. (Dkt. 11, Opp.). Petitioner filed her reply the next day. (Dkt. 12, Reply).

Having reviewed and considered all the briefing filed with respect to petitioner's Application, the court finds that oral argument is not necessary to resolve the Application, see Fed. R. Civ. P. 78; L. R. 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## BACKGROUND

Petitioner is a Nicaraguan citizen. (See Dkt. 5-4, Exh. C at ECF 8, 30). She is a physician and a single mother of two children, ages six and nine. (See id. at ECF 10); (Dkt. 9, FAP at ¶ 2). She fled Nicaragua, fearing she would be tortured or killed by the authoritarian government in retaliation for her political views. (See Dkt. 5-4, Exh. C at ECF 15). On December 21, 2022, immigration authorities encountered petitioner near Eagle Pass, Texas. (See Dkt. 5-4, Exh. A, Form I-213 at ECF 2-3). Petitioner was arrested and transported to a border patrol station for processing. (Id.).

On December 21, 2022, petitioner was charged with being an "alien present without admission or parole" and therefore inadmissible pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).[1] (See Dkt. 5-4, Exh. A, Form I-213 at ECF 3). However, she was paroled the following day "due to a lack of detention capacity in the USBP Del Rio Sector" and "released with an I-94 as an Alternate to Detention as a Condition of the Parole." (Id. at ECF 2-3); (see also Dkt. 9, FAP at ¶ 3). On December 23, 2022, petitioner was notified of her enrollment in an Alternatives to Detention ("ATD") program, which explained that her "release is contingent upon [he]r enrollment and successful participation" in the program, during which she would "be subject to electronic monitoring and may be subject to a curfew." (Dkt. 5-4, Exh. B at ECF 5). The notice advised

---

[1] Petitioner's DHS Form I-213, titled "Record of Deportable/Inadmissible Alien," lists petitioner's sole "Current Administrative Charge[]" to be "212a6Ai - ALIEN PRESENT WITHOUT ADMISSION OR PAROLE - (PWAs)". (Dkt. 5-4, Exh. A, Form I-213 at ECF 3). Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA") is "codified at 8 U.S.C. § 1182(a)(6)(A)(i)." J.U. v. Maldonado, 2025 WL 2772765, *1 (E.D.N.Y. 2025). Unless otherwise indicated, all section references are to Title 8 of the United States Code.

petitioner that "[f]ailure to comply with the requirements of the ATD program will result in a redetermination of you[r] release conditions or your arrest and detention." (Id.). As part of her participation in ATD, petitioner was given a GPS-enabled cell phone that she was required to use for checking in with ICE. (See Dkt. 9, FAP at ¶ 57).

Following her parole release, petitioner stayed with a relative in Georgia. (See Dkt. 9, FAP at ¶ 57). On or around January 27, 2023, at an ICE check-in in Atlanta, petitioner turned in the GPS-enabled cell phone to ICE at the agency's request and was released from the ATD program. (See Dkt. 5-3, Declaration of Carrie LeRoy ("LeRoy Decl.") at ¶ 5); (Dkt. 9, FAP at ¶ 3). Petitioner then traveled to California to live with her boyfriend. (See Dkt. 9, FAP at ¶ 58).

On December 20, 2023, petitioner filed an application for asylum and withholding of removal under the Convention Against Torture. (See Dkt. 5-4, Exh. C at ECF 7-8). Her subsequent application for work authorization – based on her status as an asylum applicant – was approved on October 1, 2024, and is set to expire on September 29, 2029. (See Dkt. 5-4, Exh. D, Approval Notice at ECF 52) (reflecting eligibility class "C08"); see also 8 C.F.R. 274a.12(c)(8) (codifying employment eligibility category (c)(8), which permits employment authorization for aliens who have "filed a complete application for asylum or withholding of removal of deportation pursuant to 8 CFR part 208"and whose applications have been pending for at least 150 days without a decision).

Petitioner was working and living with her boyfriend in Hayward, California when she received a notice to report for an ICE check-in on August 13, 2025, in San Francisco. (See Dkt. 9, FAP at ¶¶ 4, 60-61). Petitioner went to the check-in, at which point she was arrested by ICE officers without a warrant and transported to the Adelanto ICE Processing Center ("Adelanto"). (See id. at ¶¶ 1, 4, 60). Petitioner was charged with being subject to removal pursuant to § 212(a)(7)(A)(i)(I) of the INA, codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I). (See id. at ECF 54, 57). A week after her arrest, petitioner was served with a Notice to Appear ("NTA") before an immigration judge. (See Dkt. 5-4, Exh. E, Notice to Appear at ECF 54).

Petitioner has remained in Adelanto since her arrest on August 13, 2025.[2] (See id. at ¶ 10). As a result of her detention, petitioner has been separated from her loved ones and community, and has also lost her employment, housing, and financial support for her children. (See id. at ¶ 11); (Dkt. 5-4, Exh. F, Letter to Judge Maury at ECF 59).

Petitioner asserts five causes of action related to her detention: (1) violation of the Due Process Clause of the Fifth Amendment ("substantive due process claim"); (2) violation of the Due Process Clause of Fifth Amendment ("procedural due process claim"); (3) violation of the Fourth Amendment for unlawful arrest; (4) violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.; and (5) violation of the INA, 8 U.S.C. § 1226(a). (See Dkt. 9, FAP at ¶¶ 65-90).

Petitioner contends that a TRO is warranted because she is likely to succeed on the merits of her substantive and procedural due process claims, will continue to "suffer immense irreparable injury[,]" and both the balance of equities and public interest weigh in her favor. (See Dkt. 5, Application at 11-19). Petitioner seeks a TRO enjoining respondents from (1) detaining her unless she is provided with an individualized bond hearing before an immigration judge within seven days of the court's order, during which respondents will be required to prove by clear and convincing evidence that petitioner is either a danger or a flight risk; and (2) transferring, relocating, or removing petitioner from the Central District of California absent further court order and pending resolution of the litigation. (See Dkt. 5-6, Proposed Order at ¶¶ 1-2).

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 65 provides courts with the authority to issue preliminary injunctions and TROs. See Fed. R. Civ. P. 65(a) & (b). The purpose of a preliminary injunction "is to preserve the status quo and the rights of the parties until a final judgment" on the merits can be rendered, see U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a TRO is to "preserv[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing" for the preliminary injunction. Reno Air Racing Ass'n., Inc. v.

---

[2] On September 23, 2025, prior to obtaining counsel, petitioner sought her release through a bond hearing in her immigration case. (Dkt. 9, FAP at ¶ 62). Petitioner's request was subsequently denied. (Id.).

4

McCord, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty., 415 U.S. 423, 439, 94 S.Ct. 1113, 1124 (1974)). The standards for a temporary restraining order and a preliminary injunction are the same. See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n. 7 (9th Cir. 2001); NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P., 788 F.Supp.2d 1111, 1117 (C.D. Cal. 2011) (same). "Like a preliminary injunction, a temporary restraining order is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Six v. Newsom, 462 F.Supp.3d 1060, 1067 (C.D. Cal. 2020) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 376 (2008)).

A plaintiff seeking a preliminary injunction or TRO must establish that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. Winter, 555 U.S. at 20, 129 S.Ct. at 374. Under the Ninth Circuit's "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). "For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." Id. The last two Winter factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 1762 (2009).

Rule 65(c) "invests the district court with discretion as to the amount of security required, if any[,]" for a temporary restraining order or preliminary injunction. See Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks omitted). Accordingly, the court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the [respondents] from enjoining his or her conduct." Id.

## DISCUSSION

I.   EX PARTE RELIEF.

As an initial matter, the court is not persuaded by the government's argument that petitioner has not met the standard for ex parte relief. (See Dkt. 11, Opp. at 3-4). The ex parte standard

requires that a party make two showings. "First, the evidence must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures. Second, it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." Mission Power Eng'g Co. v. Cont'l Cas. Co., 883 F.Supp. 488, 492 (C.D. Cal. 1995). Petitioner has made the necessary showings. First, prolonging petitioner's detention throughout the regular noticed motion process would constitute irreparable injury due to the unlawful deprivation of liberty. See, e.g., Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks omitted).

Second, petitioner is without fault in creating the circumstances requiring ex parte relief. Indeed, as petitioner notes in her Reply, "[t]he fact and manner of Respondents' . . . unlawful re-detention of Petitioner without notice or cause . . . is precisely the reason that she could not seek a restraining order immediately following her re-detention." (Dkt. 12, Reply at 6). Moreover, through a letter dated September 22, 2025, petitioner sought temporary release from detention to, among other things, find an attorney. (See Dkt. 5-4, Exh. F, Letter to Judge Maury at ECF 59). But petitioner's request for release on bond was denied by the immigration judge. (See Dkt. 5-3, LeRoy Decl. at ¶ 7). Therefore, petitioner remained unrepresented by counsel from the date of her detention on August 13, 2025, until October 6, 2025. (See Dkt. 5-3, LeRoy Decl. at ¶¶ 1, 3). Petitioner's Application was filed on October 23, 2025, just over two weeks after obtaining counsel. (See Dkt. 5, Application). These facts affirm that petitioner was without fault in creating the circumstances requiring ex parte relief.

II.     STATUTORY AND REGULATORY FRAMEWORK.

Because petitioner's arguments implicate the statutory and regulatory framework governing her detention and parole, the court begins with an overview of those frameworks and their application to her parole, its revocation, and her current detention.

///

A.      Admissibility.

"The Immigration and Naturalization Act ('INA') establishes the framework governing noncitizens' entry into and removal from the United States, with regulations promulgated by the enforcing agencies providing further governance." Y-Z-L-H v. Bostock, 792 F.Supp.3d 1123, 1132 (D. Or. 2025). The implementation of this framework "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." Jennings v. Rodriguez, 583 U.S. 281, 286-87, 138 S.Ct. 830, 836 (2018). But formal admission is not only assessed at the border or ports of entry. Pursuant to 8 U.S.C. § 1225,[3] "an alien who arrives in the United States, or is present in this country but has not been admitted, is treated as an applicant for admission." Jennings, 583 U.S. at 287, 138 S.Ct. at 836 (internal quotation marks omitted). "The INA has many categories of 'inadmissibility.'" Bostock, 792 F.Supp.3d at 1132. For example, "[n]oncitizens who arrive at a port of entry without a visa or other entry document . . . are deemed 'inadmissible' under 8 U.S.C. § 1182(a)(7)," id., whereas an "alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible" under § 1182(a)(6)(A)(i). The admissibility inquiry presents a critical juncture because "[i]f an alien is inadmissible, the alien may be removed." Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 108, 140 S.Ct. 1959, 1964 (2020).

B.      Removal Proceedings.

The INA provides the government with "two main processes for removing noncitizens deemed ineligible to enter or remain in the United States." Espinoza v. Kaiser, 2025 WL 2675785, *4 (E.D. Cal. 2025). "The first, commonly referred to as 'Section 240' or 'Section 1229a' proceedings, is the standard mechanism for removing inadmissible noncitizens." Id. These standard removal proceedings take place before an immigration judge ("IJ"), and consist of "adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses." Coal. for Humane Immigrant Rts. v. Noem,

---

[3] Unless otherwise indicated, all future statutory citations will be to Title 8 of the U.S. Code.

7

("Coalition"), 2025 WL 2192986,*3 (D.D.C. 2025). "A second, even more streamlined form of proceeding [is] applicable only to certain noncitizens: expedited removal." Id. Noncitizens placed in expedited removal proceedings are initially interviewed by an immigration officer rather than an IJ, and are not entitled to counsel during this questioning. Id. If a noncitizen indicates an intent to apply for asylum or fear of returning to their home country, they may avail themselves of "a truncated asylum process [that] require[s] that the noncitizen remain detained throughout the process." Bostock, 792 F.Supp.3d at 1132.

Pursuant to § 1225(b)(1), expedited removal only applies to a limited subset of applicants for admission. J.S.H.M. v. Wofford, 2025 WL 2938808, *4 (E.D. Cal. 2025). "Simply put, an applicant is eligible for expedited removal only if the immigration officer determines that the individual is inadmissible on one of two grounds: fraud or misrepresentation (§ 1182(a)(6)(C)) or lack of documentation (§ 1182(a)(7))." Innovation L. Lab v. McAleenan, 924 F.3d 503, 507 (9th Cir. 2019). Among that subset, expedited removal is limited to only two categories of noncitizens: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve] not been admitted or paroled into the United States" and cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." Coalition, 2025 WL 2192986, at *5 (citing 8 U.S.C. § 1225(b)(1)(A)(i)–(iii)). "The statute permits the Attorney General (who has since delegated this authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. And that designation lies within the Secretary's 'sole and unreviewable discretion.'" Id. (quoting § 1225(b)(1)(A)(iii)); see 8 C.F.R. § 235.3(b)(ii).

C.    Detention and Parole Pending Removal.

"Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings." Jennings, 583 U.S. at 286, 138 S.Ct. at 836 (2018). Within the INA, "[t]he two principal statutes that govern the detention of noncitizens pending removal proceedings are 8 U.S.C. § 1225 and § 1226." Maldonado, 2025 WL 2772765, at *4 (E.D.N.Y. 2025). "[T]he two provisions are exclusive; a noncitizen can only be subject to § 1225 or § 1226, not both." Id. "[S]ection 1225 authorizes the Government to detain certain aliens

8

seeking admission into the country," while "section 1226 authorizes the government to detain certain aliens already in the country pending the outcome of removal proceedings." Lepe v. Andrews, 2025 WL 2716910, *3 (E.D. Cal. 2025) (internal quotation marks omitted). Detention under § 1225 "is generally mandatory," while detention under § 1226 "is generally discretionary." Savane v. Francis, 2025 WL 2774452, *1 (S.D.N.Y. 2025).

1. **Detention, Parole, and Parole Revocation Under § 1225**.

As previously noted, § 1225(a) deems any "alien present in the United States who has not been admitted[,] or who arrives in the United States" to be an "applicant for admission." 8 U.S.C. § 1225(a)(1). "[A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." Jennings, 583 U.S. at 287, 138 S.Ct. at 837. Section 1225(b)(1) is the "expedited removal statute," and as discussed, applies to "arriving noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements," and to certain other noncitizens designated for expedited removal by the Secretary of Homeland Security. J.S.H.M., 2025 WL 2938808, at *4-5. "Section 1225(b)(2) is broader . . . [and] serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." Jennings, 583 U.S. at 287, 138 S.Ct. at 837. While noncitizens covered by § 1225(b)(1) are subject to expedited removal, noncitizens covered by § 1225(b)(2) are placed in full removal proceedings. See J.S.H.M, 2025 WL 2938808, at *4-5. However, "[l]ike section 1225(b)(1), section 1225(b)(2) [also] mandates detention." Mata Velasquez v. Kurzdorfer, 2025 WL 1953796, *5 (W.D.N.Y. 2025).

"The only exception to the mandatory detention required by section 1225" is codified at § 1182(d)(5)(A). See Mata Velasquez, 2025 WL 1953796, at *5. Pursuant to that provision, a "noncitizen may nonetheless be, in the discretion of the Secretary of Homeland Security, 'parole[d] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]'" Maldonado, 2025 WL 2772765, at *5 (quoting § 1182(d)(5)(A)). By regulation, a noncitizen may only be released pursuant to § 1182(d)(5)(A) "provided the [noncitizen] present[s] neither a security risk nor risk of absconding." Fernández López v. Wofford, 2025 WL 2959319, *2 (E.D. Cal. 2025)

9

(quoting 8 C.F.R. § 212.5(b)). Release under this provision therefore "reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." Id. "Such parole, however, shall not be regarded as an admission of the alien." Jennings, 583 U.S. at 288, 138 S.Ct. at 837 (internal quotation marks omitted). Instead, such parole "permits a noncitizen to physically enter the country . . . subject to a reservation of rights by the Government that it may continue to treat the noncitizen as if stopped at the border." Lopez Benitez v. Francis, 2025 WL 2371588, *3 (S.D.N.Y. 2025) (citation omitted).

DHS may terminate this parole when, in the opinion of the DHS Secretary, "the purposes of such parole . . . have been served," and upon termination "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission[.]" 8 U.S.C. § 1182(d)(5)(A). Critically, however, the implementing regulation requires that "DHS must provide 'written notice to the [noncitizen]'" prior to revocation of parole. Mata Velasquez, 2025 WL 1953796, at *5 (quoting 8 C.F.R. § 212.5(e)(2)(i)). Moreover, a written notification that does not attend to the individualized reasons for the revocation is insufficient. Instead, "both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole must attend to the reasons an individual [noncitizen] received parole." Mata Velasquez, 2025 WL 1953796, at *10 (internal quotation marks omitted); see, e.g., Bostock, 792 F.Supp.3d at 1146 (finding that the government's "mass distribution, standard-form email" purporting to revoke petitioner's § 1182(d)(5)(A) parole provided insufficient written notice because it lacked individualized reasons for the revocation); id. ("[W]ritten notice is a _necessary_ but not a _sufficient_ condition for compliance with [8 C.F.R. § 212.5(e)(2)(i)]").

2.  **Detention, Parole, and Parole Revocation Under § 1226**.

As noted, § 1226(a) "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings[.]" Jennings, 583 U.S. at 289, 138 S.Ct. at 838. Specifically, § 1226(a) provides:

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United

10

> States. Except as provided in subsection (c) and pending such decision, the Attorney General –
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on –
>
> > (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
> >
> > (B) conditional parole[.]

8 U.S.C. § 1226(a). Pursuant to implementing regulations, "[a]n immigration officer makes the initial determination to either detain or release the noncitizen, but after that decision has been made, the noncitizen may request a bond hearing before an immigration judge." Lepe, 2025 WL 2716910, at *3 (citing 8 C.F.R. § 1236.1(c)(8), (d)(1)). "Section 1226(a), therefore, establishes a discretionary detention framework," where a noncitizen is entitled to, "at a minimum, . . . an appeal before an immigration judge." Lopez Benitez, 2025 WL 2371588, at *3-4. As with parole granted under § 1182(d)(5)(A), the implementing regulations for § 1226(a) "require that the noncitizen 'demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons' and that the noncitizen is 'likely to appear for any future proceeding.'" Fernandez Lopez, 2025 WL 2959319, at *2 (quoting 8 C.F.R. § 1236.1(c)(8)). An immigration judge reviewing the custody determination of an ICE officer at a bond hearing "must consider the same factors." Lopez Benitez, 2025 WL 2371588 at, *10. Therefore, release under this provision necessarily "reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." Fernandez Lopez, 2025 WL 2959319, at *2 (internal quotation marks omitted).

Pursuant to § 1226(b), "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). The implementing regulations elaborate that "such release [under § 1226] may be revoked at any time in the discretion of" various DHS officials, "in which event the alien may be taken into physical custody and detained." 8 C.F.R. § 1236.1(c)(9) (emphasis added). "However, if an immigration judge has determined the noncitizen should be released, the DHS

may not re-arrest that noncitizen absent a change in circumstance." J.S.H.M, 2025 WL 2938808, at *4.  Similarly, "[w]here the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest."  Id.; see also Saravia v. Sessions, 280 F.Supp.3d 1168, 1197 (N.D. Cal. 2017), aff'd sub nom., Saravia for A.H. v. Sessions, 905 F.3d 1137 (9th Cir. 2018) ("According to government counsel, DHS has incorporated . . . into its practice, requiring a showing of changed circumstances both where the prior bond determination was made by an immigration judge and where the previous release decision was made by a DHS officer.").

III.     LIKELIHOOD OF SUCCESS ON THE MERITS.

    A.     <u>Petitioner is Likely to Succeed on the Merits of her Procedural Due Process Claim.</u>[4]

The court finds it irrelevant whether petitioner was originally detained pursuant to § 1225(b)(2) and paroled pursuant to § 1182(d)(5)(A), or whether she was detained and paroled pursuant to § 1226(a).  That is because respondents' failure to provide petitioner with any pre-deprivation notice or opportunity to be heard whatsoever was constitutionally deficient.

Respondents concede that "some courts have recognized due process limitations on the authority of the government to revoke parole depending on the facts of the case[.]" (See Dkt. 11, Opp. at 5).  But respondents do not address whether these due process limitations apply here, and if they do, whether they complied. (See, generally, id.).  Instead, respondents merely contend that "ICE has statutory and regulatory authority to revoke its parole decisions and initiate removal proceedings[,]" without an immigration hearing. (See id. at 5).  Respondents further contend that any ruling by this court requiring "mandatory Immigration Court proceedings would strip ICE of the ability to make such parole decisions" and "impair ICE's ability to grant conditional parole in the first place." (See id. at 6).  Respondents' contentions are not well taken.

---

[4] Petitioner also brings a substantive due process challenge to her detention. (See Dkt. 9, FAP at ¶¶ 65-69).  Because granting a preliminary injunction enjoining respondents from detaining petitioner absent a pre-detention hearing eliminates the threat of any imminent deprivation of her substantive due process rights, the court need not consider the merits of that claim at this stage of the proceedings.

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 2500 (2001). Accordingly, "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." Trump v. J. G. G., 604 U.S. 670, 673, 145 S.Ct. 1003, 1006 (2025) (internal quotation marks omitted). To be sure, there is no question that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." Demore v. Kim, 538 U.S. 510, 523, 123 S.Ct. 1708, 1717 (2003). But due process "requires some kind of a hearing before the State deprives a person of liberty or property." Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984 (1990).

Petitioner's procedural due process claim involves two steps: "the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution." Fernandez Lopez v. Wofford, 2025 WL 2959319, *3 (E.D. Cal. 2025) (internal quotation marks omitted). "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600 (1972). To determine what protections due process demands in a given situation, courts consider three factors: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value of additional safeguards; and (3) the government's interest, including the function involved and the burdens that would be imposed by additional process. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903 (1976).

1. **Petitioner Possesses a Protected Liberty Interest in Remaining out of Custody.**

Petitioner invokes "the most significant liberty interest there is – the interest in being free from imprisonment." Velasco Lopez v. Decker, 978 F.3d 842, 851 (2d Cir. 2020). While "the initial decision to detain or release an individual may be within the government's discretion, the government's decision to release an individual from custody creates 'an implicit promise,' upon

which that individual may rely, that their liberty 'will be revoked only if they fail to live up to the . . . conditions of release.'" Pinchi v. Noem, 792 F.Supp.3d 1025, 1032 (N.D. Cal. 2025) (alteration marks omitted). Accordingly, "[w]hen an immigrant is placed into parole status after having been detained, a protected liberty interest may arise," and the "Due Process Clause may protect this liberty interest even where a statute allows the immigrant's arrest and detention and does not provide for procedural protections." Espinoza, 2025 WL 2675785 at *9.

Here, petitioner's "release from ICE custody constituted an implied promise that her liberty would not be revoked unless she failed to live up to the conditions of her release." Pinchi, 792 F.Supp.3d at 1034 (internal quotation marks omitted); see also Noori v. Larose, 2025 WL 2800149, *10 (S.D. Cal. 2025) ("Detention pending removal proceedings has two regulatory goals – ensuring future appearances and preventing danger to the community. This logically also extends to the granting of parole and its revocation.") (internal citation and quotation marks omitted). Thus, regardless of which statute initially authorized her parole, petitioner has a protected liberty interest in remaining out of custody absent a showing that she poses a risk of flight or danger.[5] See, e.g., Fernández López, 2025 WL 2959319 at *4-5 (finding that petitioner released from immigration detention on parole had protected liberty interest in remaining out of custody regardless of whether she was paroled under § 1182(d)(5)(A) or § 1226(a)); Noori, 2025 WL 2800149 at *4, 9-10 (finding that petitioner who was paroled from immigration detention under § 1182(d)(5)(A) had protected liberty interest in remaining out of custody).

/ / /

---

[5] Moreover, petitioner's liberty interest has strengthened with time and reliance. More than two-and-a half years elapsed between petitioner's release on parole and her arrest on August 13, 2025. During that time, petitioner was fully compliant with the conditions of her release. (See Dkt. 9, FAP at ¶¶ 63, 80). Respondents do not contest this. (See, generally, Dkt. 11, Opp.). During her time on parole, petitioner began a life in the United States. She "applied for and received a work permit, timely applied for asylum in the United States[,] and was employed and living in an apartment with her boyfriend." (Dkt. 9, FAP at ¶ 4). Her employment allowed her to provide for her children, who depend on her alone for financial support. (Dkt. 5-4, Exh. F, Petitioner's Letter at ECF 59). These community ties "underscore the high stakes of her liberty." See Pinchi, 792 F.Supp.3d at 1033.

2. **Petitioner was Entitled to a Pre-Deprivation Bond Hearing and Notice Prior to Revocation of her Parole.**

Under the circumstances, due process requires that respondents provide petitioner with notice and a pre-deprivation bond hearing prior to revocation of her parole.[6] See, e.g., Mata Velasquez, 2025 WL 1953796 at *17 ("To mitigate the risk of erroneous deprivation, due process requires, at a minimum, the opportunity for Mata Velasquez to submit evidence relevant to whether the government should revoke his parole before it makes a revocation decision.") (internal quotation marks and alterations omitted); Fernández López, 2025 WL 2959319 at *6 ("Given the absence of any procedural safeguards to determine if her re-detention was justified, the probable value of additional procedural safeguards, i.e., a bond hearing, is high."); Pinchi, 792 F.Supp.3d at 1035 ("[I]t is clear that there is a significant risk that the government will erroneously deprive Ms. Garro of that liberty interest if it does not provide her with a pre-detention hearing."); Valdez v. Joyce, 2025 WL 1707737, *4 (S.D.N.Y. 2025) ("In the context of revocation of civil release, an individual whose release is sought to be revoked is entitled to due process such as notice of the alleged grounds for revocation, a hearing, and the right to testify at such a hearing.") (internal quotation marks omitted). There is no evidence, nor even a suggestion, that respondents employed any procedures before revoking petitioner's parole.[7] (See, generally, Dkt. 11, Opp.).

---

[6] At the bond hearing, the government bears the burden of demonstrating by clear and convincing evidence that detention is necessary to prevent danger to the community or flight. See Pinchi, 792 F.Supp.3d at 1038 ("Ms. Garro Pinchi may not be detained unless the government demonstrates at such a bond hearing, by clear and convincing evidence, that she is a flight risk or a danger to the community and that no conditions other than her detention would be sufficient to prevent such harms."); J.S.H.M, 2025 WL 2938808, at *18 ("Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.").

[7] Indeed, it does not appear that respondents even complied with the limited amount of process contemplated by the relevant statutes and regulations. (See, generally, Dkt. 11, Opp.). First, the government did not provide petitioner with written notice prior to her parole revocation, as is required by § 1182(d)(5)(A)'s implementing regulations. (See Dkt. 9, FAP at ¶ 73); 8 C.F.R. § 212.5(e)(2)(i) ("[P]arole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole.") (emphasis added); (see, generally, Dkt. 11, Opp.). Nor did the government arrest petitioner pursuant to a warrant, as is contemplated in connection with revocation of bond under § 1226(b). (See Dkt. 9, FAP at ¶ 4);

Accordingly, under the second Mathews factor, the risk of an erroneous deprivation of petitioner's liberty interest is high. See Fernández López, 2025 WL 2959319, at *6 ("[T]he risk of an erroneous deprivation [of liberty] is high where, as here, [the petitioner] has not received any bond or custody redetermination hearing.") (internal quotation marks omitted).

The court is not persuaded by the government's contention that "any alleged violations of specific aspects of release revocation procedure" can be cured by post-deprivation relief.[8] (See Dkt. 11, Opp. at 8). First, while the government is correct that this court and others have recently ordered post-deprivation bond hearings in response to habeas petitions contesting detention under § 1225(b), (see Dkt. 11, Opp. at 7), none of those cases involved a petitioner who had previously been released on parole and who therefore had a protected liberty interest in his or her release.

Second, any suggestion that petitioner can simply request a bond hearing while in detention – as she and her counsel have done twice, (see Dkt. 9, FAP at ¶ 62) – is misleading. Respondents' position is that "Immigration Judges lack authority to hear bond requests or to grant bond" to "immigrants like Petitioner [who] are detained under 8 U.S.C. § 1225(b)(2)[.]" (See Dkt. 11, Opp. at 6). Thus, the only post-deprivation bond hearing remedy purportedly available to petitioner is illusory because immigration judges have been barred from granting such bond

---

8 U.S.C. § 1226(b) ("The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien."); (see, generally, Dkt. 11, Opp.). The government's failure to comply with even this limited process underscores the risk of erroneous deprivation.

[8] The cases cited by the government in support of post-deprivation relief, (see Dkt. 11, Opp. at 8-9, 8 n. 1), are either factually distinguishable or unpersuasive because they do not provide reasoned analysis justifying post- rather than pre-deprivation relief. See Ahmad v. Whitaker, 2018 WL 6928540, *1, 5-6 (W.D. Wash. 2018) (petitioner was subject to final order of removal, and his release was therefore subject to different conditions regarding the viability of his removal), rep. & rec. adopted, 2019 WL 95571 (W.D. Wash. 2019); Doe v. Smith, 2018 WL 4696748, *1, 9 (D. Mass. 2018) (same); Perera v. Jennings, 2021 WL 2400981, *6 (N.D. Cal. 2021) (ordering post-deprivation relief without analysis as to why pre-deprivation relief was not necessary); Pham v. Becerra, 2023 WL 2744397, *7 (N.D. Cal. 2023) (same); Carballo v. Andrews, 2025 WL 2381464, *8 (E.D. Cal. 2025) (ordering post-deprivation relief without analysis beyond citing Pham and Perera); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493 (1985) ("[T]he root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant [protected] interest.") (internal quotation marks omitted).

hearings. This underscores that pre-deprivation relief is needed to grant petitioner a meaningful opportunity to be heard. See Espinoza, 2025 WL 2675785 at *11-12 (explaining that because the immigration judge declined to exercise jurisdiction and found petitioners subject to mandatory detention, the bond hearings did not provide "an opportunity to contest the existence, nature, or significance of the supervision violations").

       3.  **Respondents' Interest Does Not Outweigh the First Two Factors**.

  "As to the third and final Mathews prong, the Attorney General's discretion to detain individuals . . . is valid where it advances a legitimate governmental purpose, such as ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." Maldonado, 2025 WL 2772765, at *10 (internal quotation marks and alterations omitted). Respondents do not contend that petitioner was detained for such purposes. (See, generally, Dkt. 11, Opp.). Instead, the record shows that for nearly 32 months petitioner complied with the conditions of her parole, completed her brief enrollment in the ATD program, adhered to all immigration law requirements, timely filed an asylum application, and obtained lawful work authorization. (See Dkt. 9, FAP at ¶ 79). "Simply put, there is no evidence that Petitioner posed a risk of flight or danger to the community sufficient to justify h[er] detention. Thus, Respondent has failed to show a significant interest in Petitioner's continued detention." Maldonado, 2025 WL 2772765, at *10.

  Respondents contend without elaboration that pre-deprivation hearings would "impair ICE's ability to grant conditional parole in the first place." (See Dkt. 11, Opp. at 6). It is not immediately obvious to the court how pre-deprivation hearings would impact ICE's authority over granting parole, and the court is not persuaded by respondents' unsubstantiated claim. See, e.g., McClain v. Wells Fargo Bank, N.A., 2012 WL 851402, *3 (N.D. Cal. 2012) (rejecting defendants' "undeveloped argument" because they "neither cited any legal authority nor provided the requisite legal analysis"); Indep. Towers of Wash. v. Washington, 350 F.3d 925, 929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."). In short, "there is no countervailing government interest . . . that supports conducting a

bond hearing only after [petitioner] has been detained, rather than in advance thereof." Pinchi, 792 F.Supp.3d at 1036.

Because each of the Mathews factors favors petitioner, the court finds that she has shown a likelihood of success on the merits of her procedural due process claim.

IV. LIKELIHOOD OF IRREPARABLE HARM.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690 (1976)); see Hernandez v. Sessions, 872 F.3d 976, 994-95 (9th Cir. 2017) (recognizing the "irreparable harms imposed on anyone subject to immigration detention" and holding that plaintiffs had "established a likelihood of irreparable harm by virtue of the fact that they are likely to be unconstitutionally detained for an indeterminate period of time"). Where "the alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Warsoldier v. Woodford, 418 F.3d 989, 1001-02 (9th Cir. 2005) (internal quotation marks omitted). The court therefore finds that petitioner would be immediately and irreparably harmed by the continued deprivation of her liberty in violation of her procedural due process rights.

V. BALANCE OF THE EQUITIES AND PUBLIC INTEREST.

The final two merged factors likewise weigh heavily in favor of petitioner, who seeks to vindicate a constitutional liberty interest in the face of likely unlawful detention. Although respondents assert that the public has a significant interest in the execution of its immigration laws, (see Dkt. 11, Opp. at 11), that interest cannot justify the violation of petitioner's constitutional rights. See Index Newspapers LLC v. U.S. Marshals Serv., 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted); Vargas v. Jennings, 2020 WL 5074312, *4 (N.D. Cal. 2020) ("Just as the public has an interest in the orderly and efficient administration of this country's immigration laws . . . the public has a strong interest in upholding procedural protections against unlawful detention.") (internal quotation marks and citation omitted); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to

18

allow the [government] . . . to violate the requirements of federal law[.]") (internal quotation marks omitted).

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Petitioner's <u>Ex Parte</u> Application **(Document 5)** is **granted** as set forth in this Order.

2. Respondents shall release petitioner from immigration detention forthwith, and shall not impose any release restrictions on petitioner, such as electronic monitoring, unless deemed necessary at a future pre-deprivation bond hearing.

3. Respondents must file with the court a Notice of Compliance within twenty-four (24) hours of releasing petitioner.

4. Respondents may not re-detain petitioner during the pendency of these proceedings without providing petitioner with, at minimum, individualized notice describing the change in circumstances necessitating her arrest and detention, and a pre-deprivation bond hearing before an immigration judge. Petitioner may not be detained unless respondents demonstrate at such a pre-deprivation bond hearing, by clear and convincing evidence, that she is a flight risk or a danger to the community, and that there are no conditions that will reasonably assure petitioner's appearance and the safety of any other person in the community. If petitioner is again placed into detention in this District following proceedings compliant with this order, respondents shall not transfer or remove petitioner from this district unless executing a final order of removal issued against petitioner.

5. Given that the standard for granting a TRO and preliminary injunction are the same, <u>Stuhlbarg Int'l Sales Co.</u>, 240 F.3d at 839 n. 7, the court will construe petitioner's Application as an application for a preliminary injunction ("PI Application").

6. Respondents shall file their opposition to the PI Application by no later than **November 21, 2025**. Failure to file their opposition by the deadline set forth above shall be deemed as consent to the granting of the PI Application.

7. Petitioner shall file her Reply in support of her PI Application by no later than **November 26, 2025**.

8. The court shall decide, after reviewing the parties' papers, whether to hold a hearing on the PI Application or take the PI Application under submission.

Dated this 17th day of November, 2025.

                                                      /s/
                                    Fernando M. Olguin
                                United States District Judge